## TEXAS & N. O. R. CO. v. ZARATE.

No. 2599.

Court of Civil Appeals of Texas. Beaumont.

July 14, 1934.

Rehearing Denied Oct. 10, 1934.

Roy L. Arterbury, of Houston, and Seale & Thompson, of Nacogdoches, for appellant.

Adams & McAlister, of Nacogdoches, for appellee.

COMBS, Justice.

The appellee, Lena Zarate, as plaintiff, filed this suit in the district court of Nacogdoches county against the appellant, Texas & New Orleans Railroad Company, as defendant, to recover damages in the sum of $30,000 for the death of her husband, Joe Zarate, who, it is alleged, was negligently struck and killed by one of defendant's trains near Corrigan, Polk county, Tex., between 3 and 4 o'clock on the morning of May 3, 1931. None of the witnesses who testified saw the accident and the evidence bearing upon the issue of defendant's negligence is wholly circumstantial. The body of the deceased was found near defendant's railroad track about 600 yards north of Corrigan on the morning of May 3, 1931. The circumstances warrant the inference that he was killed by defendant's southbound passenger train which went through Corrigan at about 3:45 a. m. on that morning.

The deceased, Joe Zarate, was a section hand employed by the defendant. He and his wife lived in a section house located on defendant's right of way about one and one-half miles north of the town of Corrigan. The evidence shows that deceased and others living in the vicinity of where he lived ha-bitually used the railroad as a footpath in walking to and from the town of Corrigan, particularly during the daytime. The evidence does not show that pedestrians used the railroad extensively as a passageway at night, but we think it sufficient to show that it was not unusual for persons to be walking upon the track at night. The plaintiff, Lena Zarate, testified that Joe left home about 9 o'clock on the night of his death, with Martine Cruse, another section hand, to go to Corrigan, and that she was notified of his death next morning after daylight.

W. C. Burks, night watchman at Corrigan, testified that on the night in question he saw Martine Cruse, whom he knew, in company with a small Mexican whom he knew only as "Shorty," near the depot in Corrigan at about 1:30 a. m.; that the little man was drunk and "whooping it up," and Cruse, who was a large man, was holding him up. That Cruse loosed his hold on "Shorty" and he fell to the ground; that he (Burks) started over to where they were, intending to take them in custody, and Cruse helped "Shorty" up and they started on down the railroad track in the direction of where Zarate's body was found next morning; that he followed them a short distance and, it appearing that they were going on out of town, he turned back and did not see them any more. There is some evidence in the record that Zarate was never known as "Shorty" and that another Mexican, who was about Corrigan at that time, and who was much larger than Zarate, was called "Shorty." However, Burks testified that he knew the other "Shorty" and that he was not the one with Cruse on the occasion in question. Burks did not view the body of Zarate, but we think his testimony sufficiently identifies the little man whom he saw with Cruse as being the deceased. Other than the proof that there was another "Shorty," the only proof offered by plaintiff in rebuttal of Burks' testimony that deceased was drunk was that of two witnesses who viewed the body after the accident and who testified that they did not detect the odor of whisky. One of these witnesses, Tony Sanchez, stepson of deceased, testified that after the body had been carried to Lufkin he got Mr. Marcus Gibson and Dr. Denman to make an examination of the body for the purpose of ascertaining whether Zarate had been drinking; that he was present when the stomach pump was used; and that he did not detect the odor of whisky. Neither Mr. Gibson nor Dr. Denman was called as a witness, and the failure

to offer their testimony is not explained in any way.

Plaintiff's witness Yancey Cockrell testified that on the night in question about 3:30 a. m. he walked along the railroad track from Corrigan to his home, which was beyond the place where Zarate's body was found; that when he came to the place where Zarate's body was later found he saw two Mexicans; one was sitting in the bar ditch about ten feet from the track and the other was nearer the track. It was dark, but he could see that one was a large man and the other a small man. When he got near them, the one sitting in the ditch, who was the larger man, stood up, and the smaller man said, "Who is that?" The witness seems to have passed on by without making any reply. He stated that he was a bit afraid of the men. The smaller man walked over to the track and sat down on the end of the cross-ties, while the other remained standing in the bar ditch. The witness last saw them in such position when he had passed some thirty steps beyond them and looked back. This was about fifteen minutes before the south-bound passenger train passed. Witness heard it pass just after he reached his home, which was about one-half mile from the scene of the accident. Talley Hill, who had formerly been a deputy sheriff, testified that Martine Cruse came to his house soon in the morning and notified him that Joe Zarate had been killed. Cruse was under the influence of liquor at that time. The witness went to the scene of the accident, which was only a short distance from his home. The body of Zarate was on the north side of the track at the edge of the ballast which was five or six feet from the north rail. His left shoulder, head, and neck had been struck and the neck was broken. The body was lying with the head toward Lufkin, the direction from which the train had come, but apparently Cruse had turned it around, as blood on the ground indicated that the body had fallen with the head toward Houston. The witness observed that some one apparently had vomited at the end of the cross-ties near where the body was found. It was shown by another witness that a number of Chesterfield cigarette stubs were found at that point. The deceased smoked Chesterfield cigarettes. Cruse, who it is shown circumstantially was with the deceased when he was killed, was not produced as a witness by either side, and his absence from court is not explained.

The only issue of defendant's negligence submitted to the jury was failure to keep a proper lookout. With reference to that issue it was shown that the track was straight for a considerable distance in either direction from the place of the accident. The track was slightly downgrade toward Corrigan and there was nothing to obscure the view of the track for a long distance in the direction from which the train approached. Plaintiff's witness Owen Colvin testified that on the night in question he was working at a filling station located about one-half mile north of the Corrigan depot; that the filling station was situated on the public highway about 300 yards east of defendant's railroad; that he was standing in the door of the filling station when the south-bound passenger train passed just before 4 o'clock. He testified that the train was traveling very fast; that he did not see any one in the engine cab; that the cab was sufficiently lighted that he could have seen the "bulk" of any one in the cab; and that the whistle was not blown or the bell rung for Cockrell crossing, which crossing was nearly opposite the filling station and about 200 yards north of where deceased was killed. On cross-examination witness stated that he did hear the whistle blown for Corrigan, and further stated that he would not say there was no one in the engine cab when the train passed, but if any one was in there he did not see him.

Plaintiff placed defendant's engineer and fireman on the stand. The engineer, S. L. Coker, testified that he was engineer of the south-bound passenger train which passed through Corrigan on the morning of May 3, 1931; that he was keeping a lookout as he approached Corrigan and at the point where the body of deceased was found; that if a man had been on the track along there he could have seen him, as the track was open and clear, and that he did not see any one along the railroad at that point and did not know that the train had struck any one until he reached Houston next morning, when it was reported to him that the body of Zarate had been found; that he then made a careful inspection of his locomotive to see if he could find any sign of hair, blood, or other evidences of the engine having hit any one; and that he found nothing. The coaches had already been detached from the locomotive and he made no inspection of them. On cross-examination this witness gave his opinion as to how the accident might have happened without his knowing about it. He testified: "I never would have known it because I think if the train killed him the engine went by and he was asleep and in the

dark he just jumped against the train or raised up. He might have been pretty close and raised up. A car might have struck him. I am sure that my engine did not hit that fellow." The witness explained that he kept his lookout down the track and that he probably would not have seen a man out on the right of way or one lying down near the track unless he had moved so as to attract his attention, and further that the headlight was focused several hundred feet ahead of the locomotive, for which reason he would not have seen one on or near the track after the engine got within 150 feet of him. He further testified that at the speed he was making and considering the downgrade of the track at the place where deceased was killed, he could not have stopped the train under about 1,200 feet, which was two train lengths. Plaintiff offered one witness who had had some experience as an engineer on another railroad, who testified that the train could have been stopped in 300 feet. The fireman, C. E. Newman, corroborated the engineer as to keeping a lookout and that no one was seen at the point where Zarate was killed. He said that if a man had been sitting on the ties on his side of the train he could have seen him. He was not present when the engineer inspected the locomotive.

The trial was to a jury, and defendant's motion for instructed verdict being overruled, the case was submitted to the jury on one issue of liability, and that was whether or not the operatives of the train were keeping a proper lookout on the occasion in question. The jury found that the operatives of the train did fail to keep a proper lookout; that such failure was negligence and the proximate cause of the injuries received by Joe Zarate. The amount of plaintiff's damages was fixed at $2,500. In response to other special issues the jury found that Zarate was not under the influence of intoxicating liquor, and that he was not sitting or lying down near the track at the time of and immediately prior to receiving his injuries. On the verdict of the jury the trial court entered judgment for the plaintiff for $2,500.

The sufficiency of the evidence to raise the issue of defendant's liability and to sustain the findings of the jury against it is the only question presented by this appeal.

Zarate was not killed at a public crossing. And while, as we have already said above, it was shown that pedestrians habitually used the railroad as a footpath, particularly during the daytime, we do not think the evidence will warrant the inference that deceased was so using it when he received his injury. The stepson, Tony Sanchez, testified that when he viewed the scene of the accident about noon of the day it occurred, he observed a track inside of the north rail apparently made by some one in a hurry. He made no attempt to identify the footprint as Zarate's. It is shown that a number of persons had been to the scene before Sanchez viewed it, the inquest had been held there, and the body removed. This testimony of Sanchez is the only evidence of any footprint or other marks tending to show even remotely that deceased was standing or walking upon the track at that point prior to his injury. The evidence showed, we think conclusively, that deceased was not using the railroad as a footpath at the time of his injury. Apparently, he had stopped at the place where he was killed and had remained there for some time, possibly for more than two hours. He had certainly been there fifteen minutes, according to Cockrell's testimony, and the five or six cigarette stubs indicate that he had been sitting or loitering about the track there for a much longer time.

Upon these facts the appellant advances the proposition that it owed no duty to deceased to keep a lookout to discover him. This contention is based on the rule stated in such cases as Smith v. I. & G. N. R. Co., 34 Tex. Civ. App. 209, 78 S. W. 556, and Missouri, K. & T. Railway Co. v. Cowles, 29 Tex. Civ. App. 156, 67 S. W. 1078, to the effect that the only duty owed by a railroad company to a trespasser is that of using all means in its power to keep from injuring him after his perilous position is discovered. It is now well settled that such is not the rule in this state. In St. Louis S. W. Railway Co. v. Watts, 110 Tex. 106, 216 S. W. 391, 392, Mr. Justice Greenwood, speaking for our Supreme Court, and quoting from Texas & P. Railway Co. v. Watkins, 88 Tex. 24, 29 S. W. 232, thus states the rule: "The true rule is that it is the duty of the servants of the railroad company operating its trains to use reasonable care and caution to discover persons on its track, and a failure to use such care and caution is negligence on the part of such company, for which it is liable in damages for an injury resulting from such negligence, unless such liability is defeated by the contributory negligence of the person injured, or of the person seeking to recover for such injury, and the circumstances under which the party injured went upon the track are merely evidence upon the

issue of contributory negligence. If such circumstances show that the party injured was a wrongdoer or trespasser at the time of the injury, the issue of contributory negligence is, as a general rule, established as a matter of law; but not so in all cases. It results from the above, that it was the duty of the railroad to use ordinary or reasonable care to discover and warn defendant in error, whether she be considered a trespasser or a mere licensee, and a failure to use such care was negligence, rendering the railroad liable for such damages as resulted therefrom, unless under all the circumstances defendant in error was guilty of negligence contributing proximately to her injury."

■ So we think the appellant did owe the deceased the duty of keeping a proper lookout to discover him in time to avoid injuring him, notwithstanding the evidence fully warrants the inference that he was a trespasser. Even so, however, we will say in passing that we are doubtful that the evidence as a whole, which we have rather fully summarized above, supports the jury's finding that the operatives of the train did fail to keep a proper lookout, especially in view of the positive testimony of the engineer and fireman that they did keep a lookout and the engineer's explanation of how the deceased may have been on or near the track without his seeing him.

■ But if it be conceded that such issue was raised and that the evidence was sufficient in probative force to sustain the jury's finding convicting the defendant of negligence in failing to keep a proper lookout, nevertheless it wholly failed to show any causal connection between the failure to keep a lookout and the death of Zarate. The burden of proof was upon the plaintiff not only to establish the negligence of the defendant, but also to establish a causal connection between such negligence and the injury complained of. The fact of causal connection between an alleged negligent act or omission and the injury can no more be presumed than can the act or omission itself. Texas & P. Ry. Co. v. Shoemaker, 98 Tex. 451, 84 S. W. 1049, 1051; Houston E. & W. T. Ry. Co. v. McHowell, 278 S. W. 258, 2 S.W.(2d) 550 (Tex. Civ. App., writ refused).

■ The McHowell Case, supra, was twice appealed to this court from a judgment against the defendant, and each time it was reversed on the ground that no causal connection was shown between the alleged negligence and the injury. In that case McHowell,

the deceased, a night watchman for the defendant, was killed by falling under a moving passenger train while walking along a pathway which paralleled the railroad track. There, as here, no one saw the accident, but it was shown that the defendant had placed and negligently permitted to remain numerous large lumps of burnt gumbo or ballasting material along the sides of the track and in the path which deceased was using and which the defendant knew the deceased and other pedestrians habitually used as a walkway. It was plaintiff's theory, and the circumstances were at least consistent with it, that deceased stumbled over some of the loose ballast and was thereby caused to fall under the train. On the first appeal the case was remanded in order that the plaintiff might have opportunity to more fully develop it. See 278 S. W. 258. On the second appeal the case was reversed and rendered. See 2 S. W.(2d) 550. Justice O'Quinn vigorously dissented on the second appeal on the ground that the evidence which he summarized in the dissenting opinion (2 S.W.(2d) 251) did establish causal connection. The Supreme Court denied a writ of error.

We think the evidence in the McHowell Case tended more strongly to show causal connection between the negligence and the injury than do the facts in this case. There the body was discovered soon after the accident, and the position of it, together with the fact that McHowell was sober, healthy, and was killed while walking along the path where he was expected to be at the time, tended to show circumstantially that he had stumbled over the loose gumbo and fallen under the train. But here the record affords no reasonable explanation whatever as to how the deceased came to be struck by the train unless the inference that he was asleep or drunk and lying near the end of the ties and in some manner got up or raised up and was struck be accepted. There is no showing that he was walking on the track, and if he was, why he failed to see the train and get off. In such case he must have been in the glare of the headlight for some distance as the train approached and there was nothing to distract his attention from it. What did he do from the time Cockrell saw him sitting on the ties until the train struck him? Did he remain there until he was struck? Did he attempt to cross the track ahead of the train? There is no showing of any reason why he should have crossed the track. Was his companion, Cruse, drunk and on the track and he was struck while trying

to get him off? There is not the slightest showing by footprints, marks on the ground, or otherwise that Cruse was ever any nearer the track at that point than the bar ditch where Cockrell last saw him standing. There is not one fact or circumstance in the record to warrant any reasonable inference that the operatives of the train could have discovered the deceased in time to avoid injuring him if they had been keeping a lookout. For aught the record shows he may have walked into a place of danger near the track at a time when the train was so near it could not have been stopped. Or he may have gotten up and fallen into the side of the train after the locomotive had passed. The evidence does show that when struck he was on the north or engineer's side of the track and that he was struck a glancing blow possibly by some projecting portion of the train.

In the Shoemaker Case, supra, two boys were struck and killed by defendant's passenger train while on the track at night. The track was much used by pedestrians and the grounds of negligence was failure to keep a proper lookout, and it was shown that the engineer had defective vision. The issue of defendant's negligence was raised, but in holding that no causal connection between the negligence and the injury was shown, Judge Williams, speaking for the Supreme Court, said: "The unfitness of the engineer only affects the question as to whether or not a proper watch was kept along the track. The presumption is that there was, and it will hardly do to say that it is overcome by mere proof of the unexplained killing and of the engineer's defective vision. There was also a fireman on the engine, who, for aught that appears, could have performed this duty so far as it affected the deceased. But, aside from this, the failure to keep a proper lookout, either from incapacity or other reason, could only be deemed the proximate cause of the deaths when it appeared that the keeping of it would have prevented the unfortunate occurrence, and no inference of this fact can be drawn from the evidence. What were the boys doing as the train approached them? How long were they on the track before they were struck? What was their position? An answer to these questions must be found before it can be said that there was a failure to keep a proper lookout, and that such a lookout would have discovered them in danger in time to have enabled those controlling the train to have saved them; and for such an answer the evidence may be searched in vain. This fact of causal connection between an alleged negligent act or omission and an injury can no more be presumed than can the act or omission itself."

■ We have set out and discussed the facts of this case rather fully because of the earnest insistence of appellee that this case is on "all fours" with the case of St. Louis Southwestern Railway Co. v. Douthit (Tex. Civ. App.) 208 S. W. 201. A careful reading of the opinion in that case will show that the facts were quite different in many material respects from the facts in the case before us. For instance, it will be noted that Douthit was killed at a public crossing where the law imposed on the operatives of the train the duty of keeping a proper lookout and the statute required that the whistle be blown and the bell rung. The lookout was not kept and the statutory signals were not given. The circumstances, marks on the ground, position of Douthit's wounds, etc., were all fully shown, and the circumstances *excluded* the theory that he was lying or sitting on the track, but showed that he was standing up and stepping off the crossing when he was struck. These circumstances fully justified the reasonable inference that Douthit would have gotten off the track and have avoided the injury had he been warned in time of the approach of the train. The opinion emphasizes these distinguishing facts as taking the case out of the rule announced in the Shoemaker Case. In the case before us, facts and circumstances leading to the reasonable inference that the death of Zarate was caused by defendant's failure to keep a lookout, and excluding any reasonable inference that it might have happened without such negligence, are wholly lacking. Defendant's liability cannot be predicated upon a mere guess, surmise, or presumption, when it is just as reasonable to presume that the injury resulted from some nonactionable cause. Gulf, C. & S. F. R. Co. v. Davis (Tex. Civ. App.) 161 S. W. 932; Davis v. Castile (Tex. Com. App.) 257 S. W. 870.

A careful study of the record convinces us that plaintiff could not materially strengthen her case and that no good purpose would be served by remanding the case for a new trial.

It follows from what we have said that the case should be reversed and rendered for appellant, and it is so ordered.

WALKER, Chief Justice (dissenting).

Under the Watts Case, cited by the majority opinion, the defense against the fail-

ure to exercise the duty of keeping a look-out is contributory negligence on the part of the injured party. I think the evidence abundantly supports the jury's finding acquitting the deceased of contributory negligence; that is, at the time of his death the deceased was not drunk, and was not lying down on or near the railroad track at the time of and immediately prior to his death. On the issue of drunkenness, as shown by the majority opinion, after Zarate's death (about two hours) two witnesses examined his body and found no indication that he had been drinking on the day of his death. An autopsy, examination of the stomach, was performed upon his body, and one witness testified that no sign of alcohol was discovered by the autopsy. Appellant made no effort to rebut this testimony. True, appellant's witness testified that about 1 a. m. on the morning Zarate was killed he saw a Mexican named Cruse in charge of a small Mexican who was drunk, and that they left Corrigan, walking down the railroad track towards the section house where Zarate lived. He testified further that the small Mexican was known in Corrigan as "Shorty," and that Cruse appeared to be sober. All the testimony was that no one called Zarate "Shorty," but that another Mexican in Corrigan was called by that name. The testimony was further to the effect that when Cruse reported the death of Zarate he was under the influence of liquor. If it be conceded that the "Shorty" whom the witness saw with Cruse was in fact Zarate, a concession contrary to all the evidence, the circumstances raised the issue that it was Cruse and not Zarate who was drunk at 1 a. m.

In support of the jury's finding that Zarate was not lying down on or near the railroad track, the following circumstances were in evidence: The witness Yancy Cockrell testified that not more than fifteen minutes before Zarate was killed, he saw the two Mexicans standing near the railroad track at the place where Zarate was killed. One of them was a large man and one was a small man. One of them spoke to him and came up to the railroad track and sat down on the cross-ties near the witness. I do not agree with my Brethren that this witness said with certainty that it was the small man who sat down on the cross-ties. In his direct testimony he made that statement, but on cross-examination said that he could not say whether it was the small man or the large man who approached him. I give his testimony this construction because he identified the man who spoke to him by the color of his shirt, and it

was shown that Zarate did not have on the kind of shirt worn by the man who approached the witness and sat down on the ties. As Zarate was sober, on the verdict of the jury, it would not be a reasonable inference to say that he had taken care of his drunken friend Cruse from 1 a. m. until 3:30 a. m., at which time he was standing up, walking around, and then within fifteen minutes abandoned his charge and lay down and went to sleep on or near the railroad track—which is the inference appellant draws as a matter of law from the testimony in order to convict Zarate of contributory negligence. The circumstances clearly support the inference that it was Cruse who was drunk, who approached the railroad track and sat down on the cross-ties, who smoked the cigarettes, and who vomited near the place where the cigarette stubs were found.

The evidence also satisfactorily supports the finding of the jury that Zarate was not sitting down on or near the railroad track. The testimony of appellant's engineer and fireman supports this conclusion. They said that they kept a lookout at the time and place on the occasion of Zarate's death. They further said that had he been sitting on or near the railroad track they would have seen him, but would not have seen him had he been lying down near the railroad track, but would have seen him had he been sitting on the railroad track.

These were the only issues of contributory negligence submitted to the jury. If other issues of contributory negligence were raised by the evidence, appellant abandoned them by not asking for their submission.

If the deceased was not lying down or sitting down on or near the railroad track, inquiry arises: Where was he? Under the verdict of the jury, which in my judgment is well supported, either Zarate was standing on or near the railroad track as the train approached, or he was so far away from the track that the engineer and fireman could not see him, and then deliberately walked into the train.

The evidence satisfactorily rebuts the inference that Zarate was standing so far away from the track as not to be in the view of the engineer and fireman. Standing away from the track, why should he, a sober man, walk deliberately into the train after the engine had passed? Had he been drunk enough such an inference would be reasonable, but he was not drunk. Such an inference would convict Zarate of suicide; the inference is that he did not commit suicide. The burden rested

upon appellant to establish that issue by a preponderance of the testimony. The wounds on the body of the deceased could have been inflicted either by the engine or by the coaches. The coaches were in appellant's possession and, though having an opportunity after the accident, it made no examination of them.

In my judgment the circumstances more satisfactorily support the conclusion that Zarate was struck by the engine while standing on or near the railroad track. Tracks were found on the railroad track near where he was killed, indicating that some one in haste tried to get off the track. There was no other explanation of these tracks.

The evidence supports the verdict that appellant's agents did not keep a proper lookout at the time Zarate was killed. On the trial, the engineer and fireman testified on this issue that they kept a most careful lookout; that, though nearly two years had elapsed, they had an independent recollection of keeping a lookout at the very place and time Zarate was found dead. The jury was authorized to conclude that this testimony was "a little too strong." As shown by the majority opinion, one of appellee's witnesses testified that he saw appellant's train pass his filling station on this particular occasion; that the whistle was not blown nor the bell rung for the crossing near where Zarate was killed; and that he saw no one in the engine cab, and could have seen them had they been sitting where it was necessary for them to sit to keep a lookout. These are not the very words of the witness, but clearly the effect of his testimony. If he was standing on or near the track—and the evidence supports that conclusion—and had the engineer and fireman kept a lookout, they would have seen him. The fact that they did not see him supports the finding that they did not keep a lookout. The holding in Texas & N. O. R. Co. v. Spencer (Tex. Civ. App.) 244 S. W. 1089, 1093, supports the conclusion. In that case it was said: "The track was straight for about 1,200 yards west of the place of the accident. There was nothing to obstruct the view of the operatives of one on the track, whether he was standing up or lying down. The evidence showed that had Vestal been lying down the operatives could have seen him, in the exercise of ordinary care, in time to have stopped the train, and thus avoided injuring him. These facts warrant the inference that the operatives failed to keep a proper lookout."

On this construction of the testimony the jury was justified in finding the issue of proximate cause in favor of appellee; for, as the deceased was standing on or near the railroad track, he was in the view of the engineer and fireman for more than fifteen hundred feet as the train approached, and the train could have been stopped, under the evidence of one expert witness, within three hundred feet.

The theory of the majority opinion is that it is just as reasonable to conclude that Zarate was killed under circumstances where a lookout would not have protected him as that a lookout would have protected him. The McHowell and other cases cited and reviewed by my Brethren are in point only if they have correctly construed the testimony. But if I have correctly construed the testimony, the issue of proximate cause was clearly raised.

St. Louis S. W. Railway Co. v. Douthit (Tex. Civ. App.) 208 S. W. 201, is interestingly in point in support of the jury's verdict on the facts of this case. In this case the jury found the very facts in favor of appellee, which make the Douthit Case in point. In attempting to distinguish the Douthit Case, the majority opinion assumes that the jury findings were without support.

I would add that the damage assessed at only $2,500 clearly indicated that the jury weighed with the greatest care all the testimony in the record.

It is my conclusion that the judgment of the lower court should be affirmed.